## CENTRAL KENTUCKY NATURAL GAS CO. v. RAILROAD COMMISSION OF KENTUCKY et al.

District Court, E. D. Kentucky.
July 11, 1932.

See, also (D. C.) 37 F.(2d) 938.

Allen, Botts & Duncan, of Lexington, Ky., and D. L. Hazelrigg, of Frankfort, Ky., for Gas Company.

Robt. H. Winn, of Mt. Sterling, Ky., and D. C. Hunter and C. M. Harbison, both of Lexington, Ky., for City of Lexington.

J. A. Edge, of Lexington, Ky., for interveners.

Before MOORMAN and HICKEN-LOOPER, Circuit Judges, and DAWSON, District Judge.

PER CURIAM.

The plaintiff in this cause seeks an injunction, enjoining the enforcement of an order of the Railroad Commission fixing a flat rate of 45 cents per thousand cubic feet as a just and reasonable rate for the natural gas service which the plaintiff furnishes to consumers of natural gas in the city of Lexington. The case is submitted on the evidence heard by the Railroad Commission. Much of this evidence is conjectural. In so far as it relates to the capital value of that part of the plaintiff's plant allocable to Lexington, it is directed to December 31, 1926. We are asked to determine the capital base as of that date.

The several estimates of value of the property differ widely. Kimball, a witness for the plaintiff, fixed the reproduction value new, less depreciation, of that part of the Central Kentucky Natural Gas Company plant allocable to Lexington at $2,028,069. Carter, a witness for the defendant, fixed the value at $1,189,489. Cirgal found the historic cost of the entire plant to be $2,653,035, without giving consideration to any going concern value and some other items, such as gas pumped and stored in the Menifee field and working capital.

■ It is apparent from an examination of the figures of each of the three witnesses referred to that no one of them proceeded in all particulars upon the correct basis. Kimball's estimates of overhead, costs of financing, etc., appear to us to be entirely too high. On the other hand, Carter left out altogether some of the items that should be considered in arriving at a fair reproduction cost new of a utility plant for rate-making purposes. The proofs show that about 55.1 per cent. of the entire value should be allocated to Lexington. Allocating to Lexington this percentage, that part of the historic cost of the property actually owned by the plaintiff and allocable to Lexington would be $1,461,822, exclusive of going concern value and some other minor items not reflected by the books of the company. It appears, too, in the proofs that in 1928 the Columbia Gas & Electric Company bought 1199/1200 of the entire capital stock of the Central Kentucky Natural Gas Company. The price paid was at the rate of $48 per share, at which rate the total sale value was $2,880,000. This was a voluntary sale, and the purchasers obviously were informed of the values represented by the property. Both parties were more or less expert on the value of such properties. Proceeding on this sales basis, the value of that part of the plaintiff's plant allocable to Lexington in the early part of 1928 would be $1,586,880.

Counsel devote considerable space in their briefs to the Menifee field. The plaintiff claims that this field had a value of $2,000,000 as a storage plant. We are not impressed with this claim, nor can we attach great importance to much of plaintiff's evidence as to the reproduction cost new of the main transmission line. This latter evidence in some of its aspects is purely conjectural. Nor can any useful purpose be served by discussing the conflicting statements of the witnesses as to the several items that ordinarily go to make up capital value. Taking into consideration all the evidence touching the different methods of arriving at such value, we find that the sum of $1,586,880 represents a fair and just value of that part of the plant actually owned by plaintiff and allocable to Lexington.

■ Another item to be considered in connection with the capital base is the distributing system in the city of Lexington. This system does not belong to the plaintiff. It is the property of the Lexington Utilities Company. The plaintiff has leased it from the Lexington Utilities Company and is using it exclusively in the distribution of gas in the city. There is a dispute as to whether the fair value of this property shall be considered as a part of the rate base, or its value be disregarded and the rental paid for its use by the plaintiff be treated as a part of the expense of operation. Probably a correct application of the principles of rate-making would require that the latter alternative be adopted. An analysis of the result in the way of returns to the company, whether we accept the valuation of the Lexington utilities plant, as fixed by Carter or as fixed by Kimball, discloses that it would be more advantageous to the consumers in Lexington to treat the value of the distributing system as a part of the rate base, and disregard the rental contract between the two companies, than it would be to treat the sum required to be paid under the rental contract as operating expense and disregard the valuation in the rate base. Inasmuch as the plaintiff is insisting that this be done, there can be no

objection to adopting this method. A careful consideration of the figures of Kimball and Carter and of their testimony with reference to the fair reproduction cost of the Lexington Utilities property as of December 31, 1926, as depreciated to its then condition, convinces us that we should accept the value of $611,227 fixed by Kimball, especially as this does not take into consideration any going concern value. This makes the rate base, as of December 31, 1926, which is the date as of which both parties desire the valuation to be fixed, $1,586,880 plus $611,227, or a total of $2,198,107.

In 1912 a contract was made between the United Fuel Gas Company and the Central Kentucky Natural Gas Company, generally by the terms of which the United Fuel should sell and deliver gas to the Central Kentucky Gas, at a price equal to one-half of the retail price realized by the latter company. This contract was for a period of twenty years and was in full force and effect on December 31, 1926. The Columbia Gas & Electric Company owns all of the stock of the United Fuel Gas Company, and, as heretofore indicated, in the early part of 1928 it acquired substantially all the stock of the Central Kentucky Natural Gas Company. The city contends that by reason of this fact the plaintiff is not entitled to charge as an expense the price paid for gas under its contract with the United Fuel without evidence of its reasonableness. We cannot agree with this contention. On this point the case is unlike Western Distributing Co. v. Publ. Service Com. of Kansas, 285 U. S. 119, 124, 52 S. Ct. 283, 76 L. Ed. 655. Here the contract was made at arm's length, and so far as the record discloses, the United Fuel and the Central Kentucky Natural Gas Company had no relation to each other by reason of common ownership of stock at that time. That relationship did not exist prior to 1928, and inasmuch as we are asked to fix the rate base and determine the income as of December 31, 1926, we are of opinion that for such purposes we should accept the contract price of gas purchased from the United Fuel as part of the cost of operation.

The plaintiff's records show that the net operating revenues allocated to the Lexington district, disregarding rental payments to the Lexington Utilities Company under the contract heretofore referred to, and before any deduction for taxes, amortization, depletion, extraordinary maintenance, contingencies, interest and dividends, at a 40 cent rate were: "For 1922, $170,547; 1923, $217,168; 1924,

$209,767; 1925, $201,645; 1926, $225,997. And that the average from 1922 to 1926, both inclusive, was $205,025, and that the average for the years 1924 to 1926, both inclusive, was $212,470, and that at a 50-cent rate for 1926 the net operating revenue before such deductions was $318,409. After making the deductions claimed by the plaintiff on account of amortization, depletion, extraordinary maintenance and contingencies, the net income available for interest and dividends at a 40 cent rate was as follows: 1922, $21,590; 1923, $68,431; 1924, $59,102; 1925, $48,239; 1926, $74,702. And the average from 1922 to 1926, both inclusive, was $54,413, and from 1924 to 1926, both inclusive, was $60,681, and for 1926 at a 50-cent rate the net income available for interest and dividends was $156,724.

Plaintiff's exhibit on the actual operation for 1927 on the basis of a 40-cent rate for eleven months and a 50-cent rate for the month of December shows the net operating revenue before the deductions heretofore referred to of $169,695, and that after making such deductions the net income available for interest and dividends was $23,815, and for the same year 1927, on the basis of a 50-cent rate for the first eleven months and a 60-cent rate for December, the plaintiff claims that there was an operating revenue before the deductions referred to of $245,850, and a net available for interest and dividends after such deduction of $98,307.

Plaintiff also makes an estimate of what income would be produced in a normal year by applying the first schedule of 60 cents, which was promulgated in accordance with the ordinance and which was reviewed and held exorbitant by the Railroad Commission. While plaintiff shows a total revenue of $701,276 under such schedule, yet strange as it may seem, by some process of reasoning it shows a net operating revenue before the deduction of taxes, etc., on the 60-cent rate of less than was actually received in 1927 by the application of a 50-cent rate for eleven months and a 60-cent rate for one month. It is equally strange that plaintiff shows a net income available for interest and dividends under the first schedule for an assumed normal year of only $73,013, as against $98,307 for the year 1927, where a 50-cent rate was applied for eleven months of the year and a 60-cent rate for only one month. We cannot accept the soundness of any such figures.

Furthermore, in our opinion the plaintiff has made many unauthorized deductions from gross revenue. For the purpose of

amortizing and depleting that part of its plant allocable to Lexington, plaintiff has made an annual deduction of $82,477. That figure is based, of course, upon plaintiff's valuation, and, as explained by Mr. Kimball, is also based upon the theory that the entire investment should be recovered in twenty years. It was arrived at by determining what sum set aside annually and compounded at 3½ per cent. would return the capital investment in twenty years. We think the interest rate used is too low. It should, we think, be 4 per cent., as there should be no difficulty in so investing the sinking fund intended to retire the capital investment so as to produce 4 per cent. On this basis, and treating the value to be recovered at $1,526,880 (Central Kentucky Company), the annual amount necessary to be set aside to permit such recovery in twenty years would be in the neighborhood of $54,000, with no allowance whatever for salvage. We are satisfied that when salvage is taken into account, $50,000 annually is ample to return to the plaintiff at the end of twenty years that portion of the value of its property not recoverable as salvage. This would increase plaintiff's net income in all the figures above given to the extent of $32,477 for each of the years referred to.

Plaintiff has allowed as a deduction for amortization and depletion of the Lexington Utilities Company plant $12,191 annually. This was arrived at by using the same method as was used in arriving at the amortization figure for the Central Kentucky Company, except that plaintiff estimated that there would be substantially a 50 per cent. salvage on the property of the Lexington Utilities Company. On that basis, and using the 4 per cent. interest rate instead of 3½, the sum allowed annually for amortization for the Lexington Utilities Company would be $10,263 instead of $12,191, or a difference of $1,928, and the annual net income figure should be increased by this amount.

Plaintiff has allowed as a further deduction from income the annual sum of $12,878 on account of extraordinary maintenance for that part of the Central Kentucky plant allocable to Lexington. This sum was based upon a total value of $2,028,056. We think it is fair that this sum should be reduced in proportion to the difference between that valuation and the valuation of $1,586,880 as heretofore fixed. This would roughly be a reduction of one-fifth of $12,878, leaving in round numbers $10,000 annually for extraordinary maintenance for that part of the Central Kentucky plant allocable to Lexington. This would make $2,878 additional to be added to net income available for interest and dividends.

Plaintiff has allowed for extraordinary maintenance $8,384 annually for the Lexington Utilities Company plant. We think this is unreasonably large. Certainly $5,000 should be sufficient in this respect. This would leave $3,384 additional income available for interest and dividends.

Plaintiff has allowed for contingencies for the Central Kentucky Natural Gas property an annual additional sum of $5,600. We do not think this should be allowed. The extraordinary maintenance deduction heretofore allowed is sufficient to cover what was intended to be covered by the item of contingencies. This will add an additional $5,600 income available annually for interest and dividends.

Adding these sums together furnishes an additional $46,267 annually as income available for interest and dividends. This sum, added to the income of $156,724 which plaintiff admits would have been available in 1926 for the payment of interest and dividends by the application of a 50-cent rate to the business done that year, would make a total income available for interest and dividends for that year of $202,991, which would be approximately a 10 per cent. return on the total valuation of $2,198,107.

Plaintiff's figures show that by applying the 40-cent rate to the 1926 business, there was available for interest and dividends $74,702. Adding $46,267 to this sum would give $120,969 as income available for interest and dividends in 1926 on the 40-cent rate. This would be slightly less than 6 per cent. on the total valuation found by us. If plaintiff's net income as given by it under the 40-cent rate for all years from 1922 to 1925, inclusive, is increased by $46,267, we would still get less than 6 per cent. return on this valuation. It is in the record that 1926 had an unusually cold winter, and the large income for that year is explained by the plaintiff on that ground. It is admitted, however, that 1927 had an unusually mild winter, and with a 50-cent rate applied for eleven months of that year and 60 cents for one month, plaintiff shows a net return available for interest and dividends of $98,307. When this figure is increased by the sum of $46,267, we have $144,574 available for interest and dividends obtained by the application of a 50-cent rate for the entire twelve months of 1927 except

the month of December. This result may be reasonably accepted, it seems to us, as a fair prophecy of a minimum return during a normal year by the application of a 50-cent rate. This sum produces a return of substantially 7 per cent. on the valuation of $2,198,107. It seems apparent to us that a 50-cent rate may be reasonably expected to earn this return for the plaintiff.

Concededly, what may be a fair return for one utility may be inadequate for another. United Railways v. West, 280 U. S. 234, 249, 50 S. Ct. 123, 74 L. Ed. 390. Under the proofs in this case we think a 7 per cent. rate of return is an adequate return on the plaintiff's investment. The plan adopted by us provides for the return to the plaintiff of its entire capital by amortization in a period of twenty years. It permits the deduction of the necessary expenses incurred in ordinary maintenance. It furthermore sets up an annual reserve to cover extraordinary maintenance and repairs. It permits the deduction of all taxes including the federal income tax. In view of this assurance of the return of the entire principal in twenty years, and the allowance in the meantime of adequate amounts for necessary expenses and extraordinary maintenance, it seems to us that plaintiff's capital is about as safely invested as it can be under modern conditions. We therefore hold that a 7 per cent. return on the investment is adequate.

We are not determining future values, nor do we undertake to fix a rate of return applicable to a changed valuation or to any future situation involving changes in the consumption of gas, cost of operation, and the like. We think, however, that the 45-cent rate promulgated by the commission, as applicable to the date herein involved, December 31, 1926, is inadequate and must be regarded as confiscatory. An order of injunction, enjoining the enforcement of the commission's order, will accordingly be issued, provided the plaintiff file in this court in ten days a written request that this court order all funds in excess of the 50-cent rate impounded under its orders distributed to and among the consumers of the plaintiff in Lexington entitled thereto, and provided further that it file in this court within ten days satisfactory evidence that it has made written request of the Railroad Commission of Kentucky and of the Fayette circuit court of Kentucky that those tribunals make like orders of distribution of all funds in excess of the 50-cent rate which are impounded and held under their orders.